IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **Tumey L.L.P.** <br><br> and <br><br> **Tod T. Tumey** <br><br>               Plaintiffs, <br><br> vs. <br><br> **Mycroft AI Inc.** <br>    National Registered Agents Inc. <br>    120 South Central Avenue <br>    Clayton, MO 63105 <br><br> **Joshua Montgomery** <br>    75-1097 Keopu Mauka Dr. <br>    Holualoa, HI 96725-9622 <br><br> and <br><br> **Michael Lewis** <br>    723 Angelus PL. <br>    Venice, CA 90291-4918 <br><br>               Defendants. | **CASE NO.: 4:21-cv-00113** <br><br> **Defendants' Opposition to Motion for Contempt and Sanctions** |

# I. INTRODUCTION

The latest contempt motion from Plaintiffs Tumey LLP and Tod Tumey reinforces what has become the theme of this case and the related patent lawsuit before this Court: Plaintiffs would rather talk about anything but the merits of their claims. Following the Court's rejection of their bid for terminating sanctions in the patent case and a Hawaiian court's denial of their motion to dismiss in that venue, Plaintiffs again seek a procedural windfall based on an utter sideshow, focusing on salacious but irrelevant allegations regarding Defendant Joshua Montgomery's next-door neighbor that willfully distort the facts and law, as well as other assertions that this Court has already dismissed. None are valid.

According to Plaintiffs, Montgomery violated the Court's Preliminary Injunction Order in this case and a federal witness-tampering statute by "harassing" Plaintiffs and their erstwhile "witness" Christina Butler. But despite misleading the Court by omitting and misstating key facts, Plaintiffs do not come close to presenting "clear and convincing" evidence supporting contempt and sanctions. They complain that Montgomery has sued them and Butler in Hawaii, but have no basis to assert that the Court's Order prohibits such resort to judicial process, and fail to mention either Butler's long history of harassing Montgomery or the Hawaiian court's denial of their challenge days earlier. They accuse Montgomery of assaulting Butler with a shotgun, but omit evidence showing he was merely defending his home from reports of an armed intruder, and a court's issuance of a restraining order *against* Butler. They again complain of hacking and cyber-harassment, but still do not provide any evidence linking it to Defendants, and apparently have not even tried to do so, absurdly claiming that forensic proof of cybercrime is "impossible."

Plaintiffs' tactics say far more about the weakness of their case than about Defendants. The motion should be denied, and Plaintiffs should be told to focus on the merits.

## II. SUMMARY OF FACTS AND PROCEDURAL HISTORY

### A. Montgomery Sues Butler for CC&R Violations, and She Retaliates with a Harassment Campaign and by Collaborating with Plaintiffs.

Montgomery's difficulties with his next-door neighbor Butler long predate either this case or the patent case. (Declaration of Joshua Montgomery ("Montgomery Decl."), ¶¶ 2-15.) In April 2019, after Butler refused Montgomery's request that she comply with the neighborhood's covenants, conditions, and restrictions (CC&Rs) for land use, tried to interfere in the closing of Montgomery's purchase of his property, and began defaming Mycroft to potential investors online using pseudonyms, Montgomery sued Butler to enforce the CC&Rs. (*Id*. at ¶¶ 6-11.) In retaliation, throughout 2019 and 2021, Butler made false reports about Montgomery to multiple local authorities and to Montgomery's employer (the U.S. Air Force), and continued disparaging Mycroft online using fake names—conduct Butler has admitted but attributes to poor judgment during late-night drinking sessions. (*Id*. at ¶¶ 12-14, 22, 24-26, Ex. 7 at 12-14.) Montgomery reported the harassment to authorities. (*Id*. at ¶ 16.)

In early 2021, Butler began using Plaintiffs' litigation against Defendants to further her campaign of harassment and retaliation, and Plaintiffs eagerly joined in. By Butler's account, she conducted online "research" into Montgomery, learned of the patent case, studied reports on it, and read about Plaintiffs' claims that Montgomery was evading service. (*Id*. at ¶ 47, Ex. 7 at 14-15.) She says that she then contacted Plaintiffs' counsel and offered to testify in support of Plaintiffs' position on the issue, volunteering further to photograph Montgomery at his home in order to supply supporting "evidence." (*Id*. at Ex. 7 at 8-9.) Plaintiffs readily enlisted her in both the patent case and this one, having her sign two declarations in March 2021 regarding, respectively, Montgomery's whereabouts and his alleged damaging of a water pipe on her property and harassing her by flying drones near her. (*Id*. at ¶¶ 17-18.)

2

Ironically, *Butler's* harassment of and retaliation against *Montgomery* only intensified after she submitted her declarations. (Montgomery Decl., ¶¶ 17-26.) On March 26, Butler had steel spikes inserted in the ground on Montgomery's property, in a manner and location that endangered Montgomery, his family, and others. (*Id*. at ¶ 17.) She also continued repeatedly trespassing on Montgomery's property, making false reports about Montgomery to government agencies, and conducting surveillance of Montgomery, even placing a camouflaged camera on Montgomery's property to record his and his family's movements. (*Id*. at ¶¶ 19-28.) Montgomery was forced to construct a $30,000 fence to block Butler's invasion of his family's privacy. (*Id* at ¶ 30.)

**B.     Montgomery Responds to Report of Armed Intruder and Finds Butler Trespassing.**

On July 24, 2021, Montgomery's 12-year-old daughter told him that there was a strange man trespassing on their property who appeared to be armed. (*Id*. at ¶ 31.) Because Montgomery's neighborhood is rural, police response is often delayed, and residents must be self-reliant for personal security. (*Id*.) Montgomery responded to the threat by retrieving his shotgun from his gun safe and preparing to confront the intruder. (*Id*.) His wife accompanied him, and video-recorded the entire interaction to ensure that it was documented; Defendants are submitting a copy of the full recording for the Court's review. (*Id*. at ¶ 32, Exhibit 1.)

As the video recording shows, Montgomery could not see who the trespassers were until he passed his fence. (*Id*. at ¶ 33-35.) Initially, he only saw an unfamiliar man, and he held up the shotgun (without pointing it at anyone) while demanding that the man leave. (*Id*.) It was only then that Butler appeared behind the man, both of them standing on Montgomery's property.[1] (*Id*.)

---

[1] Butler's property ends, and Montgomery's begins, at the location of the white fence seen in the video. Montgomery Decl., ¶ 30, 36.

3

When Montgomery realized it was Butler, he re-engaged the safety on the gun and placed it behind the fence, while still demanding that Butler and the man stop trespassing—a proper request, particularly given Butler's recent conduct. (*Id*. at ¶ 37.) Montgomery's wife continued filming. (*Id*.) Butler's associate called 911, which Montgomery and his wife encouraged him to do. (*Id*.) Notably, the video also depicts a sledgehammer and metal spike that Butler and her associate had brought onto Montgomery's property. (*Id*.) Montgomery reported these events to the police, who told him they would have taken the same actions as him, and who took no further action. (*Id*. at ¶ 39.)

None of Montgomery's actions on July 24 were designed to harass or retaliate against Butler, or had anything to do with her involvement in this case or the patent case. He acted to protect himself and his family, in response to Butler's own unsafe and improper behavior.

Five days later, Montgomery filed an application for a restraining order against Butler based on her ongoing harassment, including the July 24 incident. (*Id*. at ¶ 41.) The court entered the restraining order. (*Id*. at ¶ 41, Exhibit 2.) Plaintiffs omitted this fact from their motion.

**C.      Montgomery Sues Plaintiffs and Butler in Hawaiian Court Under Hawaiian Law.**

On June 25, 2021, in the midst of Butler's harassment campaign and her coordination with Plaintiffs' lawsuits, Montgomery decided to again avail himself of the protections of the local courts. He filed a complaint in Hawaii's Circuit Court of the Third Circuit, raising the history of Plaintiffs' bad-faith patent and RICO lawsuits, Butler's making of false complaints against Montgomery to local law enforcement, and their collaboration by having Butler submit false declarations in Plaintiffs' cases. (Mot., Ex. 4.) As explained in the complaint, that conduct gives rise to claims of abuse of process and other torts under Hawaiian law. (*Id.*)

Butler filed an anti-SLAPP motion, seeking to have the complaint dismissed as to her. (Montgomery Decl., Ex. 6.)  The Hawaiian court denied the motion.  (Montgomery Decl., Ex. 5.) Montgomery then began pursuing discovery, during which Butler admitted some aspects of her harassment campaign.  (*Id.*, Ex. 7.)  The parties eventually engaged in a court-facilitated settlement process, with the purpose of resolving the ongoing litany of disputes between Montgomery and Butler, and attempting to achieve peace.  (*Id.* at ¶¶ 43-44, Ex. 3.)  Their counsel negotiated a settlement agreement under which, among other things, both parties would dismiss the matters leading to the restraining orders, neither party would contact the order or trespass on the other's property, and neither party would disparage the other to third parties (such as Mycroft investors).  (*Id.*)

The parties and their counsel also negotiated terms discouraging making certain further allegations against each other to law enforcement or in other legal proceedings.  Montgomery agreed to dismiss his abuse-of-process lawsuit as to Butler if she filed a certain (truthful) declaration regarding her involvement in this case and the patent case.  (*Id.*)  Butler agreed not to file further declarations in other cases involving Montgomery.  (*Id.*)  Both parties agreed not to make anonymous or false complaints against the other to various authorities or the media.  (*Id.*) Both parties and their counsel signed a settlement agreement incorporating those terms.  (*Id.*)

Plaintiffs also tried and failed to dispose of the Hawaii lawsuit.  On July 26, 2021, they filed a motion to dismiss the case against them for lack of personal jurisdiction.  (*Id.* at ¶ 45.)  On November 17, 2021, at the same time it denied Butler's anti-SLAPP motion, the Hawaiian court denied Plaintiffs' motion.  (*Id.*, Ex. 5.)  Nine days later, on November 26, Plaintiffs filed the instant motion, essentially asking this Court to do what the Hawaiian court would not by ending the Hawaiian case or forcing Defendants to pay Plaintiffs' costs in that case.

5

**D.     Plaintiffs Unsuccessfully Move for Sanctions in the Patent Case, while Delaying Discovery in this One.**

As the Court knows, this is not Plaintiffs' first motion seeking contempt and sanctions. In the patent case, they claimed that Defendants had engaged in various alleged hacking and cyber-harassment activities, complained about the Hawaii lawsuit, and argued that these and other supposed actions called for the Court to impose terminating sanctions. (*Voice Tech v. Mycroft, AI Inc.,* No. 4:20-cv-00111-RK, ECF 85, 87.) While the Court found that Defendants had improperly failed to remove certain links from Mycroft's websites (an issue they had already corrected), it largely rejected the motion and the requested remedies. (ECF 88.)

Meanwhile, nearly two years after the hacking and online harassment allegedly began, nearly one year after Plaintiffs filed this case, and despite multiple motions in two cases focusing on the cyber-misconduct claims, Plaintiffs have not produced to Defendants or this Court a single item of forensic evidence supporting their allegations, nor made any electronic systems available to Defendants for expert review and analysis.

### III.     LEGAL STANDARD

In ruling on Plaintiffs' prior contempt motion, the Court observed that the moving party must prove by "clear and convincing" evidence that the alleged contemnors violated a court order. (ECF 88 (citing *Chicago Truck Drivers v. Bhd. Lab. Leasing*, 207 F.3d 500, 505 (8th Cir. 2000))). Indeed, as Plaintiffs concede, "for a party to be held in contempt, it must have violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave." *In re Fischer*, 51 B.R. 346, 350 (B.A.P. 8th Cir. 2013). To impose sanctions that are punitive, and not just compensatory, a court must find the violation

"beyond a reasonable doubt." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178, 1186 (2017).

Without explaining how the issue relates to the standards for contempt or sanctions, Plaintiffs also cite the federal witness tampering statute, 18 U.S.C. § 1512, and several state analogues. (Pl. Suggestions at 2-3.) They provide no authority (and Defendants are aware of none) holding that those criminal statutes provide the standard for determining either compliance with a court order or the proper use of the Court's inherent authority. Moreover, among other elements, § 1512 includes specific and heightened *mens rea* requirements, such as specific intent and, in some cases, the requirement that the accused have acted "corruptly."

## IV. ARGUMENT

### A. Neither the Filing Nor the Settlement of the Hawaii Litigation Warrant Sanctions.

#### 1. Montgomery's use of the Hawaiian legal process does not violate the Court's Order or criminal witness-tampering statutes.

More than five months ago, Montgomery sought relief in a Hawaiian court under Hawaiian law in response to Plaintiffs' abusive litigation conduct and Butler's use of that litigation and other means to continue her harassment campaign. It is only a week after the Hawaiian court rejected Plaintiffs' and Butler's requests to dismiss the claims that Plaintiffs have sought a second opinion from this Court. But nothing in the Court's Order prohibited Montgomery from filing abuse-of-process or other state law claims in a proper venue. And Plaintiffs cite no authority for using a federal contempt motion to effectively divest a state court of jurisdiction over a case. Indeed, 28 U.S.C. § 2283 generally prohibits such a move.[2]

---

[2] *See, e.g., Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1013-14 (8th Cir. 2002) (discussing the Anti-Injunction Act's "absolute prohibition against enjoining state court proceedings" absent specific statutory exceptions, which are interpreted narrowly).

Notably, Plaintiffs raised this issue as part of their prior contempt motion, claiming that it amounted to "intimidation."  (ECF 87 at 4, 8 and Ex. 27.)  The Court did not find any resulting violation of the "decorum" order at issue in that motion.  The claim is even weaker here.

Plaintiffs claim that the Hawaii lawsuit is "harassment" directed at Plaintiffs and Butler, in violation of the Order.  But they cite nothing in the Order indicating that this term is meant to restrict Defendants' ability to enforce their legal rights by initiating court proceedings.  Many jurisdictions, including Hawaii, provide causes of action for abuse of the litigation process and making false reports to authorities.  In suing, Montgomery—represented and advised by counsel—has sought recourse to those laws, rather than attempting to "harass" anyone or engage in the sort of extra-judicial conduct of which Plaintiffs' complaint accuses him.

Nor does the lawsuit entail criminal witness-tampering under 18 U.S.C. § 1512 or other statutes.  It obviously does not involve killing, the use or threat of physical force, or attempts to do either, as proscribed by § 1512(a).  Plaintiffs do not claim that it has hindered, delayed, prevented, or dissuaded anyone from testifying or reporting any conduct, as covered by § 1512(d).  As to the rest of the statute, Plaintiffs have not cited any authority holding that filing a lawsuit can amount to "intimidation, threat[s], or corruptly persuad[ing]" under § 1512(b), or "obstruct[ing], influenc[ing], or imped[ing]" an official proceeding under § 1512(c).  Nor do Plaintiffs submit any evidence (and certainly nothing clear and convincing) that the intent behind the lawsuit is to suppress witness testimony rather than to win the case outright on the merits.

If Plaintiffs believe the Hawaiian lawsuit is improper, the correct venue for their arguments is in the Hawaiian courts, which provide various mechanisms for challenging allegedly frivolous or abusive litigation.  Indeed, Plaintiffs and Butler have invoked certain of those procedures, arguing in the Hawaiian case that, respectively, the court lacked jurisdiction

over Plaintiffs (*see, generally*, Montgomery Decl., Ex. 4.) and that Montgomery filed the case for "improper purposes" and with "ulterior motives," rather than to remedy any harm to Montgomery or "for any other proper purpose." (*Id.*, Ex. 6 at 4.) The Hawaiian court rejected those arguments and denied both motions, indicating that the case was properly pled and *not* abusive. (*Id.*, Ex. 5.) Having availed themselves of the Hawaiian court system to dispute Montgomery's claims, Plaintiffs cannot now seek a do-over in this Court simply because they did not prevail.

> 2. **The negotiated settlement terms were an effort to end longstanding hostilities, not criminal witness tampering.**

Plaintiffs next claim that Montgomery violated § 1512(b) by entering into a settlement agreement with Butler in the Hawaiian case that proposed to bar Butler from making further complaints about Montgomery and submitting further declarations about him in other litigation. Apparently (though not explicitly), Plaintiffs believe this requires that the Court sanction him in this case. Again, they are wrong.

The settlement agreement obviously did not "use intimidation" or "threaten" Butler, as described in § 1512(b). Nor was it an attempt to "corruptly persuade" her to do or not do anything. In that statute, the term "corruptly persuades" means "to persuade with consciousness of wrongdoing." *United States v. Bernhardt*, 903 F.3d 818, 826 (8th Cir. 2018). Some circuits, including the Ninth (where the alleged misconduct occurred) require further that the accused have sought to cause another to violate a legal duty, such as compliance with a subpoena. *Id.* (citing, *e.g.*, *United States v. Doss,* 630 F.3d 1181, 1189-90 (9th Cir. 2011)).

The settlement agreement was negotiated and drafted by counsel for both Montgomery and Butler, as part of a settlement conference. (Montgomery Decl. ¶¶ 43-44, Ex. 3.) It was

9
Case 4:21-cv-00113-RK   Document 122   Filed 12/10/21   Page 10 of 18

designed to end—or at least limit—the ongoing hostilities between the two by resolving as many of the disputed issues between them as possible. Those included not only land use and trespassing concerns, but also harassment through public disparagement and anonymous complaints to authorities. The prohibition on Butler's declarations (in all cases, not specifically this one or the patent case) was a direct response to Montgomery's claims in the Hawaiian litigation that Butler had provided false testimony in an effort to support Plaintiffs' cases and thus harass Montgomery further. It was not undertaken with any evil intent or "consciousness of wrongdoing"—by Montgomery, Butler, their counsel, or the court-appointed mediator—because it did not entail wrongdoing at all.

It is worth noting that Butler is not a genuine witness in this case. She was inserted into the case in connection with a "status report" as to service of process, and later regarding Plaintiffs' motion for preliminary injunction. She has no apparent involvement in or information regarding the events alleged in the complaint in this case or the patent litigation, and thus no additional testimony to provide. It therefore makes little sense to suggest that Montgomery acted to deter or prevent her from testifying further before this Court.

**B.    Montgomery's Protection of His Home and Family Does Not Warrant Sanctions.**

Based on misleadingly selective evidence, Plaintiffs mischaracterize the July 24, 2021 incident as Montgomery's "threatening" Butler with intent to retaliate against her or influence her testimony. He did no such thing. As discussed above and demonstrated by a more thorough record—including a longer video recording and TRO issued *against* Butler after the incident—Montgomery acted to protect his family from what he was told was an armed intruder, and turned out to be Butler and an associate trespassing on his property.

The evidence clearly refutes Plaintiffs' theory. The video, which Montgomery and his wife took in order to document the events, shows that when Montgomery brought out his firearm and set out to confront the intruder, he could not see who it was, and did not have a visual on Butler until after he had passed his fence and she had stepped out from behind the unidentified man. It also shows that after she appeared, Montgomery put the weapon away and did not "brandish" it or use it to threaten her. While he did continue to demand that she leave his property, that was entirely proper and understandable, given her history of trespassing and improper surveillance. The court that issued the TRO against Butler evidently agreed.

Nothing in Plaintiffs' evidence indicated that Montgomery planned the encounter in advance, much less that he did it to retaliate against Butler in connection with this case or to influence her testimony. Certainly, Plaintiffs have not provided "clear and convincing" evidence that the incident violated the Court's Order, which in no way affected Montgomery's right to protect his family and property.

**C.     Defendants Have (Still) Not Engaged In Any Computer-Related Misconduct.**

As in their complaint, their preliminary injunction motion, and their earlier contempt motion in the patent case, Plaintiffs allege that Defendants have engaged in a computer hacking and cyber-harassment campaign against them, their families, and their counsel. As in those earlier filings—and despite Defendants' pending discovery demands—Plaintiffs have produced zero evidence demonstrating that Defendants were involved in any such conduct. Indeed, as to most allegations, Plaintiffs have not provided meaningful evidence that *anyone* committed any misconduct. Their motion essentially concedes that they do not have any forensic evidence to support their claims, and never will. As with the prior contempt motion, Plaintiffs have fallen far short of the "clear and convincing evidence" standard, and their claims should be rejected.

Many of the cyber-misconduct claims were raised in the prior contempt motion and related reply—and dismissed. (*See* ECF 85 at 10 (discussing supposed "honeypot" incident);[3] *id.* at 9-10 (discussing June 1, 2020 email spoofed to appear from Tumey's daughter); ECF 87 at 2-3 and Ex. 1, Doc. 15-96 (attaching and discussing Feb. 9, 2020 email); *id.* at 9-10 and Ex. 8, 32-33 (attaching and discussing evidence regarding alleged March 31, 2021 malfunctioning of Plaintiff counsel's electronic document); *id.* at 11 (discussing alleged harassing phone calls to Tumey's daughter)). In rejecting Plaintiff's claims on those issues, the Court found that Plaintiff had not shown by clear and convincing evidence that Mycroft (or, by implication, the other Defendants) were behind the alleged events. (ECF 88 at 3.) What was true in September remains so today.

The handful of new cyber-related allegations are no better supported. Plaintiffs claim that in April 26-27, 2021, someone hacked Tumey's son's gaming account and made harassing phone calls to him. (Mot. at 8-9.) It is unclear why Plaintiffs chose not to raise these seven-month-old events in their prior contempt motion or reply (filed June 28 and July 21, 2021). In any event, Plaintiffs' supporting evidence consists of three paragraphs in Tumey's declaration, which provide few details, are based primarily on hearsay, and include no information whatsoever suggesting the identity of the alleged hacker or caller. (Mot. Ex. 1 ¶¶ 6-8.)

Similarly, Plaintiffs' claim that Tumey's wife's cell phone was hacked on October 4, 2021 is based on two sentences in Tumey's declaration. (Mot. at 9 and Ex. 1, ¶ 9.) He does not even explain the source of his information, nor how he knows (or could know) that whatever took place involved hacking, nor does he provide any supporting documentation or even say that

---

[3] In discussing the "honeypot" in their current contempt motion, Plaintiffs cite only their complaint, rather than any evidence. (Mot. at 17-18.) As described in both documents, the "honeypot" was a rather amateurish investigative gambit that drew no link to Defendants, as the "Paul Weller" profile on the Tumey LLP website was publicly accessible and thus easily discoverable by anyone who was regularly monitoring the website.

he has attempted a forensic investigation of the incident. Again, even assuming any hacking occurred, there is nothing to suggest who was behind it.

Plaintiffs cite two new instances in which documents their counsel were preparing became "corrupted" and malfunctioned. (Mot. 19-20.) These claims are based on brief statements in their counsel's declaration, which are partially based on hearsay and which do not explain how counsel determined that the malfunctions were due to "hacking" or other malicious conduct, much less who was behind such hacking. (*Id.,* Ex. 5, ¶¶ 3, 6.) Indeed, again, it does not appear that Plaintiffs or their counsel have even *attempted* to answer those questions.[4]

Plaintiffs also claim that "attackers" have sent them communications containing "malware" that purport to be from "opposing counsel" in separate litigation. (Mot. at 20.) But the only examples they provide are two emails allegedly made to look they came from their *co-counsel* in a single case. (*Id.*, Ex. 1, ¶ 10 and Attch. 3.) Plaintiffs do not explain how they determined the emails were not authentic, nor cite any evidence that they contained "malware." And again, they provide no basis to infer that the emails came from Defendants.

Finally, again citing only their counsels' declarations, Plaintiffs claim that they have received harassing or "spoofed" phone calls, or that others have received calls made to look like they came from Plaintiffs. (Mot. at 21 (citing Ex. 1 at 11-12, Ex. 5 at 5.)) The declarations largely do not even bother to identify their sources of information, nor provide any details. There is no indication of any forensic investigation at all. And there is still no information suggesting that Defendants were involved.

---

[4] By Plaintiffs' counsel's own account, the latter (Nov. 4, 2021) malfunction occurred "just after" he had cut and pasted text from an electronic document sent by Plaintiffs' Hawaiian counsel. (Mot. 19-20.) Before accusing Defendants of hacking, Plaintiffs might consider the possibility that Hawaiian counsel had provided a document with defective code in it.

13

Case 4:21-cv-00113-RK   Document 122   Filed 12/10/21   Page 14 of 18

Plaintiffs try to excuse their lack of any forensic evidence connecting Defendants to the purported misconduct—and their evident failure even to *look* for such evidence—by claiming that it is simply too hard to find. Citing a paragraph in a magazine article, Plaintiffs assert that what they call "direct evidence of attribution" is "rarely, if ever, attainable," and that it is "impossible" to track "experienced hackers." (Mot. at 24.) But that article actually says the exact opposite, even quoting a cybersecurity professor as explaining that "[t]he idea that attribution is not possible really doesn't carry any weight in the technically informed community anymore." (*Id.*, Ex. 13, at 2.)[5] An entire industry is devoted to conducting forensic investigations of computer activity. (*See, e.g.,* Motion, Ex. 11.) That Plaintiffs have elected not to retain any such investigators for this case is not an accident: they know well that there is no point in conducting a proper investigation because Defendants did not commit any of the acts of hacking or harassment. Plaintiffs' argument is a virtual admission that they cannot and will not be able to demonstrate Defendants' involvement at any point in this case.

**D.  Montgomery's Publication of a Children's Book Does Not Warrant Sanctions.**

The nadir of Plaintiffs' motion may be its citation of a children's book that Montgomery published to raise money for Defendants' legal expenses, based on his experiences in the patent case. Similar to their reply in support of their prior contempt motion (ECF 87 at 4 and Ex. 25-26), Plaintiffs claim that the book somehow violates the Court's preliminary injunction or is

---

[5] The notion that proving who committed cybercrime through forensic evidence is "impossible" would be news to the U.S. Department of Justice, which has conducted thousands of cybercrime investigations and regularly charges and convicts hackers based on forensic evidence, even when they have acted overseas and even when they work for foreign military or intelligence agencies. *See, e.g., Four Chinese Nationals Working with the Ministry of State Security Charged with Global Computer Intrusion Campaign Targeting Intellectual Property and Confidential Business Information, Including Infectious Disease Research*, U.S. Department of Justice Press Release, July 19, 2021, *available at* https://www.justice.gov/opa/pr/four-chinese-nationals-working-ministry-state-security-charged-global-computer-intrusion (last visited Dec. 1, 2021).

otherwise sanctionable, apparently because it "threatens violence" by ending with patent trolls melting in sunlight. This allegation barely warrants a response, other than to note that the Court's Order did not address works of historical fiction or romans-à-clef, and nothing in the book can be characterized as inciting cyberattacks, hacking, or harassment.

### E. Plaintiffs Again Request Improper Sanctions.

As in their prior contempt motion, Plaintiffs seek to gain litigation advantage (rather than simply protecting themselves) by proposing sanctions that have nothing to do with their allegations. First, they ask for sanctions against all Defendants, including Mycroft and Lewis, but do not specify any misconduct the latter two allegedly committed. Unable even to *allege* (much less prove) that they have done anything wrong, Plaintiffs instead assert—without reason or authority—that Defendants "should be required to show cause for why 18 U.S.C. § 1512(k) does not implicate [Mycroft and Lewis] in a conspiracy to commit these offenses with" Montgomery. (Mot. at 23.) That is not how the burden of proof works in a contempt motion, and the Court should extend to Plaintiffs' requests as to Mycroft and Lewis the same amount of consideration that Plaintiffs put into making them: none.

Even as to Montgomery, a number of the requested sanctions are improperly punitive or designed purely to help Plaintiffs avoid having to prove their case. For example, Plaintiffs ask the Court to (1) limit Defendants' expert witness testimony; (2) bar Defendants from using the terms "patent troll" or "NPE"; and (3) strike some or all of Defendants' pleadings. None of these have anything to do with remediating the alleged violation of the Court's Order.

### V. CONCLUSION

Plaintiffs have wasted enough of this Court's time with collateral attacks. Their motion should be denied in full, and they should be instructed to focus on the merits of their claims.

Dated: December 10, 2021                Respectfully submitted,

                                        **BUCHALTER**
                                        A Professional Corporation
                                        By: /s/ *Joshua M. Robbins*
                                        Joshua M. Robbins (*Admitted Pro Hac Vice*)
                                        Artin Betpera (*Admitted Pro Hac Vice*)
                                        18400 Von Karman Avenue, Suite 800
                                        Irvine, CA 92612

                                        Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 10, 2021, I served the foregoing Opposition to Motion for Contempt and Sanctions on all counsel of record via CM/ECF.

/s/ *Joshua M. Robbins*
Joshua M. Robbins