IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| TUMEY LLP and TOD T. TUMEY, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Case No. 21-0113-CV-W-BP |
| ) | |
| MYCROFT AI INC., JOSHUA ) | |
| MONTGOMERY, and MICHAEL LEWIS, ) | |
| ) | |
| Defendants. ) | |

## ORDER GRANTING IN PART AND DENYING IN PART
## MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs filed this suit in February 2021, asserting a variety of claims stemming from their allegation that "Defendants have undertaken and/or incited a vicious, relentless, and escalating campaign of . . . harassment by telephone and email, online hacking, phishing, identity theft, and other cyberattacks, and even threats of death and bodily harm . . . ." (Doc. 1, ¶ 3.)[1] Now pending are Defendants' Motions for Summary Judgment. With one exception, Defendants do not present any legal argument regarding the specific claims Plaintiffs have asserted. Instead, they primarily argue they are entitled to summary judgment because the undisputed facts establish Plaintiffs cannot prove Defendants engaged in the acts complained of. The one exception relates to Count VIII, which is Plaintiffs' claim for tortious interference with business expectancy. For the reasons set forth below Defendants' Motions for Summary Judgment, (Doc. 176, Doc. 177, and Doc. 178), are **GRANTED IN PART** and Defendants are granted summary judgment on Count VIII.

---

[1] According to a website maintained by the United States Cybersecurity & Infrastructure Security Agency, ("CISA"), "[p]hishing attacks use email or malicious websites to solicit personal information by posing as a trustworthy organization. . . . When users respond with the requested information, attackers can use it to gain access to the accounts." (https://www.cisa.gov/uscert/ncas/tips/ST04-014 (last visited September 9, 2022).)

# I. BACKGROUND[2]

Construed in the light most favorable to Plaintiffs, the Record contains facts that would permit a jury to find as follows:[3] Defendant Mycroft AI ("Mycroft") is a technology company. Defendant Joshua Montgomery is Mycroft's founder and was Mycroft's CEO until March 2020, at which time he became Mycroft's President and "First Officer." He resigned his officer positions in May 2022 but remains on Mycroft's Board of Directors. Defendant Michael Lewis has served as Mycroft's CEO since March 2020. Non-party Voice Tech Corporation ("Voice Tech") is also a technology company; Plaintiff Tumey LLP ("the Law Firm") represents Voice Tech in patent (and presumably other) matters, including matters relevant to this lawsuit. Plaintiff Tod Tumey is a principal at the Law Firm.

In November 2019, Plaintiffs contacted Mycroft regarding their belief that Mycroft was infringing on two of Voice Tech's patents. Mycroft did not respond, resulting in more letters from Plaintiffs. These letters were sent to Montgomery. Mycroft did not respond to these letters either, and on January 23, 2020 Voice Tech filed a patent infringement suit against Mycroft in the Eastern District of Texas.[4] Mycroft was served on January 31, 2020. On February 3, 2020 – the next business day – the Law Firm began receiving harassing phone calls, which it had never received before. (Doc. 179-1, p. 11 (Tumey Dep., pp. 67-68).) On February 5, Montgomery published a post on his blog (which appears on Mycroft's website) entitled "Troll Hunter – Mycroft's Position on Patent Trolls." (Doc. 179-19.) The post complained Mycroft had "been targeted by a patent

---

[2] The parties have agreed to many facts for purposes of this motion, and other facts are established in a Time Line the parties agree is accurate, (Doc. 179-8.) Citations to facts the parties agree to or that are contained in the Time Line will not be provided. All page numbers are those generated by the Court's CM/ECF system unless otherwise specified.

[3] In large measure, the facts presented by Defendants and the manner in which they have been presented reflects the perspective most favorable to them and not to Plaintiffs. The Court has not cited all the facts that support Defendants because the evidence must be viewed in the light most favorable to Plaintiffs and the Court cannot weigh the evidence.

[4] *Voice Tech Corp. v. Mycroft AI Inc.*, Case No. 6:20-CV-00015-JDK.

troll," identified Tumey and the Law Firm as representing the "troll" that was then pursuing Mycroft, and used rather colorful metaphors to express Montgomery's distaste for patent trolls and his plans for combatting Voice Tech.[5] Almost immediately, the Law Firm began receiving emails (many of which were anonymous) containing insults, threats, and generally expressing displeasure at the Law Firm's actions. In addition, both Tumey and the Law Firm received notices that someone was attempting to access various of their accounts, signing them up for various mailing lists, and creating online accounts (including at least one fake email account) in their names.

Voice Tech dismissed its suit in Texas on February 11, 2020, and one week later refiled the suit in the Western District of Missouri.[6] On April 2, 2020, Voice Tech filed a "Motion for Order to Require Decorous and Civil Conduct by the Parties." The motion detailed Mycroft's and Montgomery's public statements about Voice Tech and the harassment and other conduct directed at the Law Firm and Tumey. In the next few days, (1) unauthorized attempts were made to remotely access the Law Firm's servers, (2) Tumey's wife had her Twitter account suspended due to multiple attempts by others to hack her account, and (3) the Law Firm began receiving phone calls from companies responding to emails purportedly sent by the Law Firm seeking information about their businesses.

The Honorable Roseann Ketchmark, the District Judge to whom the case was assigned at the time, held a hearing on April 14 and at the end of the hearing granted relief to Voice Tech. On April 27, and for approximately five days thereafter, a large number of fake emails purporting to be from a non-existent attorney working at the Law Firm were sent to tens of thousands of law

---

[5] This is just one of several statements by Montgomery expressing his animosity toward Voice Tech and Plaintiffs. The Court will not document them all, but notes that in one Montgomery discussed recent developments in the litigation between Voice Tech and Mycroft and concluded by advising that one should not "pick fights with folks who specialize in information warfare [or y]ou'll get your ass kicked." (Doc. 194-5, p. 6.)

[6] *Voice Tech Corporation v. Mycroft AI Inc.*, Case No. 20-0111-CV-W-BP ("Case No. 20-0111").

firms and other business in the United States and other countries, making it impossible for the Law Firm to send or receive emails. The "denial of service" attack[7] ended on May 1, when the "attacking server" was shut down. The parties exchanged Initial Rule 26 Disclosures on May 6, 2020. That same day, another denial of service attack was initiated; this attack was similar to the first. The denial of service attacks were very sophisticated and require advanced technical expertise to implement. (*E.g.*, Doc. 194-6, ¶ 35.)

On May 29, Voice Tech served interrogatories and its Disclosures of Claims and Infringement Contentions on Mycroft.[8] On June 1, Tumey (and possibly Tumey's wife) received a phishing email that was made to appear to be sent by Tumey's daughter; the phishing email contained a sophisticated computer virus. On that same day there was also an increase in attempts to hack into the Law Firm's computer system.

Plaintiffs filed the instant suit on February 24, 2021, asserting various claims arising from their contention that Defendants were responsible for the conduct described above. Lewis was served on February 26, 2021, (Doc. 7, p. 2), and between February 25 and March 8 there were multiple hacking attempts and suspicious calls to the Law Firm. (Doc. 179-8, pp. 30-31 (Entries 783-94); Doc. 194-6, ¶ 46.)

On March 16, Plaintiffs filed a Motion for Temporary Injunction, or in the Alternative, for Expedited Preliminary Injunction to prevent Defendants from engaging in any further

---

[7] According to CISA,
> A denial-of-service (DoS) attack occurs when legitimate users are unable to access information systems, devices, or other network resources due to the actions of a malicious cyber threat actor. Services affected may include email, websites, online accounts (e.g., banking), or other services that rely on the affected computer or network. A denial-of-service condition is accomplished by flooding the targeted host or network with traffic until the target cannot respond or simply crashes, preventing access for legitimate users. DoS attacks can cost an organization both time and money while their resources and services are inaccessible.

(https://www.cisa.gov/uscert/ncas/tips/ST04-015 (last visited September 9, 2022).)

[8] Documents 34 and 35 in Case No. 20-0111.

4

Case 4:21-cv-00113-BP   Document 201   Filed 09/09/22   Page 4 of 12

cyberattacks. Judge Ketchmark held a hearing on March 29 and issued an Order granting Plaintiffs' motion on March 31. Hours after Judge Ketchmark issued her Order, the law firm representing Plaintiffs in this case ("Berkowitz Oliver") had its computer system hacked. Documents related to this case were destroyed; no other documents were destroyed.

Defendants appealed Judge Ketchmark's March 31, 2021 Order. With extensions, Plaintiff's brief was due in the Court of Appeals on August 6, 2021. On August 5, Berkowitz Oliver's computers were hacked and documents relating to this case were destroyed. A similar attack was directed to an attorney at the Law Firm in November 2021; on this occasion, a document regarding related litigation between the parties in Hawaii was destroyed. Another attack was directed at that attorney in March 2022 on the day before Plaintiffs' expert report was due.

Meanwhile, in December 2021, Plaintiffs implemented what they have referred to as a "honeypot" to obtain evidence identifying the perpetrator of the attacks. A honeypot is "[a] façade [that] is set up, creating the illusion of a system that has glaring, known security issues, that would be enticing to an experienced attacker, while every aspect of it is being monitored." (Doc. 194-6, ¶ 53.)[9] The honeypot involved a fictitious cyber defense specialist named "Paul Weller," a fictitious cybersecurity firm website where Weller worked, and a fake website for Weller. (Doc. 194-6, ¶ 54.) The websites were created offline, so they could not be accessed via the internet. They were brought online a few hours before a lawyer at the Law Firm engaged in a phone conversation with one of Mycroft's attorneys, Chris DeBacker, about the patent case; during that conversation, the lawyer mentioned the Law Firm had engaged Weller to investigate cybersecurity

---

[9] Defendants quibble whether the trap at issue qualifies as a "honeypot" as that term is used in the industry (because a honeypot is often used to analyze a hacker's methods and Defendants do not believe Plaintiffs' expert "studied" the hacker's methodology). This semantic dispute is irrelevant. Regardless of what it is called, Plaintiffs implemented a trap designed to determine if Defendants were responsible for the cyberattacks forming the basis for this suit. The Court will use Plaintiffs' term to refer to this trap.

5

issues. (Doc. 1, ¶ 110.)[10] Because the fake sites were online for only a few hours, online search engines were very unlikely to direct traffic to them. Thus, the only way the fake websites would have traffic is if someone knew to look for the links to Weller's fake sites – and initially DeBacker was the only person not involved in the honeypot to know Weller was retained by Plaintiffs. "Over the next several days, multiple hacks and known exploits were attempted," and all such "hack attacks . . . would have come from directly accessing the . . . fictional web page, and following the link there." (Doc. 194-6, ¶ 56.)

Plaintiffs asserted ten claims against Defendants. Three were dismissed by Judge Ketchmark, (Doc. 101), and the following claims remain:

- Count I – Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO);
- Count II – RICO conspiracy against Montgomery and Lewis only;
- Count III – Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;
- Count V – Tampering with computer equipment in violation of Missouri law;
- Count VI – Breach of computer security in violation of Texas law;
- Count VII – Intrusion on seclusion in violation of Texas law, asserted by Tumey only; and
- Count VIII – Tortious interference with business expectancies in violation of Missouri law.

As stated earlier, with one exception, Defendants do not dispute that the acts described in the Record support the claims asserted. They seek summary judgment on all counts, arguing there is insufficient evidence that they engaged in the acts described in the Record. They also seek summary judgment on Count VIII because there is insufficient evidence that Plaintiffs were damaged. The Court resolves the parties' arguments below.

---

[10] This is a reference to the Verified Complaint. A "verified complaint is the equivalent of an affidavit for purposes of summary judgment," *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994 (8th Cir. 2001), so the Court can consider factual allegations from the Verified Complaint.

## II.  DISCUSSION

### A.  Evidence that Defendants Engaged in the Conduct Established in the Record

Defendants' first argument is resolved with a correct understanding of the law governing summary judgment.  A moving party is entitled to summary judgment on a claim only upon a showing that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986).  In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *E.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985).

A party may seek summary judgment by establishing that there is an absence of facts that would permit Plaintiff to prevail.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325; *see also St. Jude Med., Inc. v. Lifecare Int'l, Inc.,* 250 F.3d 587, 596 (8th Cir. 2001).  "It is well-established that when a movant for summary judgment points out to the court an absence of evidence to support an essential element for which the nonmovant will have the burden of proof at trial, the nonmovant must make a sufficient showing that there is a genuine issue of fact as to that element." *Barnwell v. Watson,* 880 F.3d 998, 1005 (8th Cir. 2018).  The moving party still "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the Record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323.  But, "[i]t is enough for the movant to

bring up the fact that the record does not contain [evidence to support the] issue and to identify that part of the record which bears out this assertion. Once this is done, [the moving party's] burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists . . . . [I]t is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273-74 (8th Cir. 1988).

Finally – and critically for this case – the nonmoving party is not required to present direct evidence of the defendant's liability. "Several cases highlighted by the Supreme Court demonstrate that the nonmoving party may draw upon favorable inferences from circumstan[tial] evidence to defeat summary judgment." *Do v. Wal-Mart Stores*, 162 F.3d 1010, 1013 (8th Cir. 1998); *see also Sellner v. MAT Holdings, Inc.*, 859 F.3d 610, 615 (8th Cir. 2017) (causal connection between events can be proven with circumstantial evidence, including evidence of the timing of events); *Helmig v. Fowler*, 828 F.3d 755, 763 (8th Cir. 2016) (conspiracy can be proven with circumstantial evidence). "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quotation omitted).

In seeking summary judgment Defendants argue for application of a more demanding standard. They contend that circumstantial evidence is only sufficient if it demonstrates liability is probable and not merely possible. (Doc. 179, pp. 105-06, 117; Doc. 196, p. 7.) However, not only do the Eighth Circuit cases Defendants cite predate the authorities in the preceding paragraph, but they involved review of a trial verdict and not a ruling on a motion for summary judgment. *See Wray M. Scott Co. v Daigle*, 309 F.2d 105 (8th Cir. 1962); *Sherman v. Lawless*, 298 F.2d 899

8

(8th Cir. 1962); *Ford Motor Co. v. Mondragon*, 271 F.2d 342 (8th Cir. 1959).  This is significant because, at the summary judgment stage, the nonmoving party need not prove it is likely to win and the Court cannot weigh the evidence.  *E.g., Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The only question before the Court is whether when the evidence – including the circumstantial evidence – is viewed in the light *most favorable* to Plaintiffs, there are facts that might permit a jury to rule in their favor.[11]

There is no direct evidence that Defendants engaged in the cyberattacks on Plaintiffs.  However, inferences from circumstantial evidence might permit a jury to conclude the Defendants are liable.  Most, if not all, the attacks coincided with events related to the litigation between Voice Tech or Plaintiffs and Mycroft.  Montgomery's vitriolic comments (some of which could be found to constitute threats) may be construed as going beyond mere motive and demonstrate an inclination to engage in nonjudicial responses to the suits against him and his company.  The attacks required a degree of technical expertise that Montgomery possesses.  The honeypot also serves as evidence supporting Plaintiffs' claims.

Defendants' remaining contentions constitute arguments regarding the strength of the circumstantial evidence and often rely on their many declarations that they did not do any of the complained of acts.  These arguments will not support a claim for summary judgment when, as is the case here, the inferences that might be drawn from the circumstantial evidence could support a verdict for Plaintiffs.  Defendants' suggestions that somebody else aware of the public events in this case could have taken it upon themselves to attack Plaintiffs to benefit Mycroft also does not

---

[11] This also explains why the Court cannot rely (as Defendants suggest, (*see* Doc. 179, pp. 10-11; Doc. 196, p. 5 n.1)), on the Eighth Circuit's decision vacating the preliminary injunction Judge Ketchmark entered.  Not only is the Record now more fully developed, but a preliminary injunction requires the movant to demonstrate they are likely to succeed on the merits, *see Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 667 (8th Cir. 2022); this is a higher standard than is employed here, where the Court is forbidden from evaluating the likelihood that a plaintiff will prevail.

justify summary judgment for Defendants – particularly when some of the attacks coincided with events unknown to the public (including the honeypot).

The Court's conclusions should not be construed as holding that the evidence establishes Defendants' liability. Defendants raise several valid arguments; however, they are arguments about the importance of, and the weight to be attached to, various facts. These arguments cannot be considered by the Court and can only be considered by the finder of fact. Accordingly, summary judgment cannot be granted based on Defendants' arguments that they did not engage in the conduct at issue in this case.

### B. Tortious Interference With Business Expectancy (Count VIII)

Defendants present a separate argument with respect to Plaintiffs' claim for tortious interference with business expectancy, contending there is no evidence that would permit a jury to find that the elements are met. As discussed above, this is a viable basis for granting summary judgment. "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.,* 732 F.3d 882, 886 (8th Cir. 2013) (quoting *Celotex Corp.*, 477 U.S. at 322-23); *see also Blake v. JM Optical, Inc.,* 870 F.3d 820, 825 (8th Cir. 2017).

Under Missouri law, tortious interference with business expectancy "requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. 2017) (en banc) (quotation omitted). Defendants argue, *inter alia*, there is no evidence in the Record that would permit a jury to find that the first element is satisfied. The first element cannot be satisfied

10

"where the facts showed a mere hope of establishing a business relationship which was tenuous. . . . [I]t is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with." *Wash Sols., Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 895–96 (8th Cir. 2005) (quotation omitted); *see also Veazie-Gallant v. Brown*, 620 S.W.3d 641, 656-57 (Mo. Ct. App. 2021) (affirming judgment for defendant because plaintiff failed to present evidence that business relationship ended because of defendant's alleged interference).

Tumey was deposed on February 16, 2022. He testified Plaintiffs had no evidence demonstrating Plaintiffs suffered reputational harm, lost any existing business, or failed to procure any business they would have procured but for the cyberattacks. (Doc. 179-1, p. 18 (Tumey Dep., pp. 202-05).) The next week, Plaintiffs disclosed a February 21, 2022 email from Scott Crawford (the Law Firm's Intellectual Property Valuator and Auditor) to Tumey estimating (1) the Law Firm would have acquired twenty-four more new clients between February 2020 and January 2022, and (2) the amount of revenue those new clients would have generated. (Doc. 194-5, p. 4.) Crawford's email does not explain how he arrived at the estimate or anything about the would-be clients; it only says the Law Firm "is estimated to successfully acquire one new client per month" and he "assume[d]" the amount of business those clients would have generated. (*Id*.) Discovery closed on February 21, 2022.

The Court concludes Defendants are entitled to summary judgment because there is no evidence that would permit a jury to find Defendants' actions caused the Law Firm to lose any business. Tumey expressly disclaimed having any such evidence as of February 16, 2022. Crawford's email the following week provides no basis for the Law Firm's estimate that it would have acquired an additional client every month. The Law Firm's expectation is no better than a

11

Case 4:21-cv-00113-BP   Document 201   Filed 09/09/22   Page 11 of 12

hope for a business relationship, and a hoped-for relationship cannot form the basis for a tortious interference claim. Crawford's report also would not support a jury's finding that the cyberattacks and other tortious interference prevented the Law Firm from procuring those new business relationships.

Plaintiffs point to the abundant evidence of the cyberattacks and the logical conclusion that they harmed Plaintiffs. They also point to the evidence establishing the time it took to resolve the matter. This evidence might demonstrate Plaintiffs were damaged by the cyberattacks, but it does not demonstrate Plaintiffs lost any business or failed to obtain business relationships they reasonably expected to obtain. There being no evidence that would permit the jury to find the first element has been proven, Defendants are entitled to summary judgment on this claim.[12]

### III. CONCLUSION

For these reasons, the Motions for Summary Judgment are **GRANTED IN PART** and Defendants are granted summary judgment on Count VIII. The motions are **DENIED** in all other respects.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: September 9, 2022   UNITED STATES DISTRICT COURT

---

[12] Defendants also argue Crawford's report should be barred because it constitutes expert testimony and Crawford was never disclosed as an expert. Plaintiffs contend Crawford's report reflects only facts and does not constitute expert testimony. The Court's discussion makes it unnecessary to resolve this issue now.